## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00357          )
                                        )
JENNIFER CARRASCO,                      )
a Colorado resident,                    )
                                        )
Plaintiff,                              )
                                        )
v.                                      )
                                        )
CENTURA HEALTH CORPORATION,             )
a Colorado corporation; and CATHOLIC    )
HEALTH INITIATIVES COLORADO,            )
a Colorado corporation, d/b/a  CATHOLIC )
HEALTH INITIATIVES MOUNTAIN             )
REGION, d/b/a ST. MARY-CORWIN           )
MEDICAL CENTER.                         )
                                        )
Defendant.                              )

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiff, Jennifer Carrasco ("Ms. Carrasco"), through counsel, states the following as her Complaint and Jury Demand ("Complaint") against Centura Health Corporation and Catholic Health Initiatives Colorado (collectively, "Centura").

### PROCEDURAL EXPLANATION

The claims alleged in this case arises out of a work injury suffered by Ms. Carrasco during her employment at the St. Mary-Corwin Medical Center, in Pueblo, Colorado, and the subsequent termination of her employment by Centura as retaliation for exercising her rights under the Colorado Worker's Compensation Act, C.R.S. § 8-40-101, *et seq.* ("CWCA"), and the Family and Medical Leave Act of 1993, 29 U.S.C.A. § 2601, *et seq.* (the "FMLA"). These two claims,

however, are not all of Ms. Carrasco's claims against Centura. On or about July 12, 2017, Ms.

Carrasco also filed age discrimination, disability/perceived as disabled, and retaliation charges

alleging violations of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29

U.S.C. § 621 *et seq.* and the Americans with Disabilities Act ( the "ADA"), 42 U.S.C. § 12101 *et*

*seq.*),  with the U.S. Equal Employment Opportunity Commission ("EEOC"), arising out of the

same employment transactions and occurrences. Although Ms. Carrasco requested a right to sue

letter on at least two occasions, the EEOC has denied her requests.

Thus, this factual situation creates the following procedural dilemma: The FMLA and

workers' compensation claims must be brought in the near future to avoid limitations issues.  The

ADEA and ADA claims, by contrast, cannot currently be brought because exhaustion with the

EEOC is a jurisdictional prerequisite to bringing those claims. Yet if the ADEA and ADA claims

are not  brought in this action, they may be barred by the claim splitting doctrine.  *See, e.g., Juarez-*

*Galvan v. United Parcel Serv.*, 2014 WL 61467, at *4-5 (D. Kan. Jan. 8, 2014); *Wilkes v. Wyo.*

*Dep't of Employment Div. of Labor Standards*, 314 F.3d 501, 505-06 (10th Cir. 2002).

Under these circumstances, courts have identified five avenues available to a plaintiff to

address the claim-splitting dilemma:

> (1) he can ask the EEOC or its state counterpart to accelerate the administrative
> process; (2) he can seek an agreement with his former employer not to plead the
> statute of limitations; (3) he can agree with his employer to split a single claim into
> two or more suits; (4) he can delay the filing of the first suit until the last possible
> moment; or (5) he can request that the court postpone or stay the first case until he
> receives the right-to-sue letter.

*Juarez-Galvan*, 2014 WL 61467, at 8 (quoting *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d

337, 339 (7th Cir.1995).  The first and fourth suggestions cannot be utilized here because the

EEOC will not accelerate the administrative process, and Ms. Carrasco can no longer delay the

filing of this lawsuit. Similarly, because of the antagonism that exists between the parties, the second and third approaches seem unlikely to be successful.  Accordingly, the fifth approach – the plaintiff "can request that the court postpone or stay the first case until he receives the right-to-sue letter" – appears to be the only viable method for preserving all of her claims.  Ms. Carrasco is filing with this Complaint and Jury Demand a Motion to Stay Pending Exhaustion of Administrative Remedies.

## SUMMARY OF THIS ACTION

For almost a quarter of a century, from 1992 until 2017, Ms. Carrasco, a Registered Nurse, was employed by Centura at St. Mary-Corwin Medical Center ("St. Mary-Corwin"). After Ms. Carrasco was injured on the job in May 2016, she was placed, first, on modified duty under the CWCA for three months, and then on FMLA leave for an additional three months.

Ms. Carrasco returned to work on November 5, 2016. Three months later, on February 1, 2017, Ms. Carrasco contracted influenza, which developed into pneumonia. She took sick leave because of the flu and pneumonia, and missed, in total, six working days. When she returned to work, she was told that her position had been filled during her six-day, sick-leave absence. According to Centura, Ms. Carrasco had previously exhausted her CWCA and FMLA leave when she injured her shoulder, and thus her absences when she had influenza and pneumonia were unexcused absences.

When Ms. Carrasco challenged Centura's action, and demanded a meeting with Brian Moore, the Chief Executive Officer of St. Mary-Corwin, and Constance Schmidt-Bernhardt, its Chief Nursing Officer, she learned the true story for her termination. At that meeting, Ms. Schmidt-Bernhardt stated that "she knew all the details" about Ms. Carrasco's removal from her position as

charge nurse in the ICU. According to Ms. Schmidt-Bernhardt, Ms. Carrasco's supervisor decided she wanted to get Ms. Carrasco out of the position she held **because she had taken so much workers' compensation and FMLA leave**. When Ms. Carrasco got pneumonia and influenza in February 2017, the Hospital saw her illness as an opportunity to post her position, and remove her from it, ostensibly because she did not have any more FMLA leave and thus could not take sick leave.

This lawsuit brings an FMLA retaliation claim, and a state-law wrongful discharge claim in violation of public policy against Centura. The complaint alleges that Ms. Carrasco was retaliated against and discharged because she exercised her rights under the FMLA and under the state law CWCA.

## PARTIES

1.      Ms. Carrasco is a Colorado resident. She is currently sixty years old.

2.      Centura Health Corporation is a Colorado corporation with its principal place of business in Centennial, Colorado.

3.      Catholic Health Initiatives Colorado ("CAIC") is a Colorado corporation, with its principal place of business in Centennial, Colorado. CAIC operates under the trade name of Catholic Health Initiatives Mountain Region, which operates under the trade name of St. Mary-Corwin Medical Center.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the FMLA retaliation claim arises under the laws of the United States. (*See* 29 U.S.C.A. § 2601, *et seq.*) This Court also has jurisdiction under 28 U.S.C. § 1367 because the state law claim

for wrongful discharge is so related to the FMLA retaliation claim that they form part of the same case or controversy under Article III of the United States Constitution.

5.      This action is timely because Ms. Carrasco was retaliated against, at the earliest, on February 13, 2017; and these claims have been brought on or before February 11, 2019, less than two years after the retaliation by Centura.

6.      Venue is proper under 28 U.S.C.A. § 1391(b)(1) and (b)(2).

## FACTUAL ALLEGATIONS

7.      Ms. Carrasco incorporates by reference paragraphs 1 through 6, as if fully set forth in these factual allegations.

8.      Ms. Carrasco was hired by Centura in 1992 to work nights at St. Mary-Corwin on the Medical Surgical floor.

9.      In 1997, Ms. Carrasco transferred to the position of staff nurse in the Intensive Care Unit ("ICU"). Because she was working in the ICU, she became certified in Critical Care.

10.     In 2008 or 2009, Centura/St. Mary Corwin opened two positions for charge nurse in the ICU. When both ICU charge nurses subsequently left the Hospital, Ms. Carrasco applied for, and was hired to fill, one of the charge nurse positions. The remainder of the time Ms. Carrasco was employed by Centura/St. Mary-Corwin, she was the charge nurse in the ICU.

11.     On or about May 4, 2016, Ms. Carrasco injured her upper torso on the job.  The injury was a serious health condition that involved a "full thickness partial width and partial-thickness tears of the supraspinatus tendinous insertion [with a] Probable anterior labral tear and bilateral rotator cuff tears."

12.     Ms. Carrasco reported her injury to Centura and filled out an employee injury report.  Subsequently, Ms. Carrasco was sent to Centura's workers' compensation doctor, who placed Ms. Carrasco on modified duty because of her injury.  The modified duty was in the Quality Department. It looked over all procedures and best evidence base practices and collects data for them.

13.     For the next three months, Ms. Carrasco worked on modified duty, The pain in her shoulders continued during that time, indicating that the damage she had done had not completed healing.

14.     When Ms. Carrasco's twelve weeks of modified duty ended, Ms. Carrasco's injury had not fully healed. The Employee Health Nurse (Deborah Storey) placed Ms. Carrasco on FMLA leave. Ms. Carrasco was not familiar with the different laws relating to work-related injuries, and relied on administrators (such as Ms. Storey) with respect to the type of leave she took.

15.     Ms. Carrasco was not told that:

a.   She could not take any additional sick-leave for the next calendar year;

b.   If she took additional sick leave for the next calendar year, she could be removed from her position, and Centura could fill or not fill it at Centura's discretion.

c.   If she took the twelve-week FMLA leave and then required additional sick leave, she could be discharged or removed from her position.

16.     Ms. Carrasco asked why she was being placed on FMLA leave instead of continuing on workers' compensation leave. She was told by Ms. Story that placing employees on FMLA leave instead of workers' compensation leave was the approach Centura was taking.

17.     After Ms. Storey sent in the paperwork, Ms. Carrasco was granted three months of FMLA leave, and for the next three months, she was on paid leave.

18.     Ms. Carrasco returned to work, on November 5, 2016. At the time of her return, she was still in pain from the injury, and was receiving acupuncture every week. Nonetheless, Ms. Carrasco was able to perform, and did perform, all of the essential functions of her job. Indeed, in January 2017, Ms. Carrasco received a commendation from the Hospital for her outstanding work.

19.     When Ms. Carrasco returned to work, her manager, Dawn Anderson, seemed to exaggerate, and be overly concerned with, Ms. Carrasco's injury and the condition of her health generally. She apparently thought Ms. Carrasco was disabled because of her injury. To give one example, when Ms. Carrasco would sit on the same chairs on which she was initially injured, Ms. Anderson would say something like "please be careful how you sit down."

20.     Ms. Carrasco told Ms. Anderson repeatedly that she (Ms. Carrasco) was not an invalid, but Ms. Anderson persisted in treating Ms. Carrasco as if she were one. Ms. Carrasco perceived Ms. Anderson's behavior as being overly solicitous.

21.     For slightly less than the next three months – between November 5, 2016 and January 31, 2017 – Ms. Carrasco worked her regular job as the ICU charge nurse at St. Mary-Corwin with no incidents to suggest that she could not do her job.

22.     On February 1, 2017, Ms. Carrasco caught influenza, which developed into pneumonia.

23.     At the time Ms. Carrasco got sick, she reported her illness to the Employee Health Nurse, Ms. Storey. She told Ms. Carrasco that she (Ms. Storey) was going to submit the application

to the FMLA carrier.  Ms. Carrasco said she did not think she was eligible for additional FMLA, because, several months ago, she had used twelve weeks of FMLA leave.

24.     Ms. Storey said she was going to submit the application anyway and "see what Matrix [the carrier in charge of FMLA leave] says."

25.     Ms. Carrasco complained and stated this has nothing to do with her injury; the influenza was completely different from the injury for which she took FMLA leave. Ms. Carrasco asked, "Why can't I use my sick leave for this?"

26.     Ms. Storey responded by saying that things had changed and Ms. Carrasco's application for leave had to go through Matrix. Upon information and belief, when Ms. Storey submitted the application to Matrix, it subsequently denied FMLA leave because Ms. Carrasco had used all of her FMLA leave.

27.     Knowing that she had sufficient accrued sick/vacation leave to cover the time she was sick, Ms. Carrasco took sick leave, in total, for six working days: February 1-3 and February 8-10. (Normally, she worked three days a week, Wednesday, Thursday, and Friday, although once a month she would pick up a weekend day by working Thursday, Friday, and Saturday).

28.     At the time, Ms. Carrasco had accumulated between 70 and 80 hours of sick leave and approximately 200 hours of vacation leave.

29.     On February 13, 2017, Ms. Carrasco received clearance from her doctor to return to work.  She took the clearance letter to Deborah Storey, the Employee Health Nurse. Ms. Storey accepted the letter and asked Ms. Carrasco to let to her manager, Dawn Anderson, know that Ms. Carrasco was ready to go back to work.

30.     When Ms. Carrasco left Ms. Storey's office, she saw Ms. Anderson in the hallway. Ms. Carrasco caught up with Ms. Anderson and told her that she (Ms. Carrasco) had provided a clearance letter to the Employee Health Nurse, and was ready to come back to work.

31.     Ms. Anderson responded by telling Ms. Carrasco that she "needed to see Human Resources" about her position.  Ms. Carrasco did not understand what she was being told, so she asked "what?" Ms. Anderson said more loudly, "You [Ms. Carrasco] need to go speak to Timea Kennedy about your position."  Ms. Anderson refused to discuss the reason why Ms. Carrasco was being directed to talk to Human Resources.

32.     Totally confused, Ms. Carrasco went to the Human Resources department.  No one was there.  She waited approximately an hour and then left the hospital and went home.  When Ms. Carrasco got home, she called HR, but no one answered.  Ms. Carrasco left a message stating that her manager had told Ms. Carrasco to speak to Timea Kennedy.

33.     The next day, February 14, 2017, Ms. Carrasco received a call from Sue Bloomer, a woman who worked in the HR department at St. Mary-Corwin. Ms. Bloomer said that she had received an email – she refused to say who it was from – that informed her that she needed to call Ms. Carrasco and tell her that while she was out on sick leave with the flu and pneumonia, her position had been posted and filled.

34.     Because Ms. Carrasco had only missed six days of work – a reasonable amount of time to recover from pneumonia and influenza – she was sure that what she was being told by Ms. Bloomer could not be correct.  Ms. Carrasco asked several questions, but Ms. Bloomer said she did not have any information. She could not even tell Ms. Carrasco who had posted her position, or who had filled it.

35.     Ms. Carrasco then contacted several nurses who worked in ICU. They said Ms. Carrasco's position had not been filled, and there was now no person who was the charge nurse in the ICU department.

36.     Unable to get any answers from Ms. Bloomer, Ms. Carrasco asked for a meeting with Brian Moore, the Chief Executive Officer of St. Mary-Corwin, and Constance Schmidt-Bernhardt, its Chief Nursing Officer.  They were not able to meet with Ms. Carrasco until February 16, 2017.

37.     On February 16, 2017, Ms. Carrasco met with Mr. Moore and Ms. Schmidt-Bernhardt.  When Ms. Carrasco arrived for the meeting she discovered that a Human Resources representative, Timea Kennedy, was also present.

38.     Ms. Carrasco began the meeting by handing to Mr. Moore and Ms. Schmidt-Bernhardt the cards of commendation she had received the preceding month, in January 2017. How is it, Ms. Carrasco asked, that she could receive letters of commendation in January, and be removed from her position, and have the position posted, the following month.  Ms. Carrasco told the administrators that the commendations must not be worth the cards they were written on considering that they had posted and filled her position, and considering Mr. Moore and Ms. Schmidt-Bernhardt were people who had handwritten the commendations. Mr. Moore assured Ms. Carrasco that she deserved the commendation.

39.     Ms. Schmidt-Bernhardt then stated that she could talk about the events, as she knew all the details. According to her, Ms. Carrasco had already been gone from her job for six months in 2016 (the workers' compensation modified duty and the FMLA leave), and **Ms. Carrasco's supervisor decided she wanted to get Ms. Carrasco out of the position she held because she**

**had taken so much workers' compensation and FMLA leave**. When Ms. Carrasco got pneumonia and influenza in February 2017, the Hospital saw her illness as an opportunity to get rid of Ms. Carrasco by posting her position, and removing her from it, ostensibly because she did not have any more FMLA leave.

40.     Ms. Carrasco did not understand what Ms. Schmidt-Bernhardt was saying. Her influenza and pneumonia had nothing to do with FLMA leave. Ms. Carrasco believed that she used sick leave to take off the six days of work due to her influenza and pneumonia, and she had ample sick leave to do so.

41.     Additionally, if Ms. Carrasco had exhausted her sick leave – and she had not – she could have taken vacation leave. She had approximately 200 hours of vacation at the time.

42.     None of the administrators at the meeting – not Mr. Moore, not Ms. Schmidt-Bernhardt, and not Ms. Kennedy – responded to Ms. Carrasco's argument that she had the right to take sick leave or vacation leave, and thus the availability of FLMA was immaterial.

43.     Ms. Carrasco further stated to Mr. Moore, Ms. Schmidt-Bernhardt, and Ms. Kennedy that  she (Ms. Carrasco) was concerned that the Hospital was intentionally getting rid of older, more experienced nurses like her, and this was creating a danger to the public.  Ms. Carrasco was aware of other older nurses who had been terminated for specious reasons.  Getting rid of older, more experienced nurses, Ms. Carrasco told the administrators, created a risk that some shifts of ICU nurses would be composed solely of inexperienced nurses who were ill-equipped to handle the types of emergencies that can occur in the ICU.

44.     Neither Mr. Moore, Ms. Schmidt-Bernhardt, nor Ms. Kennedy responded directly to Ms. Carrasco's assertion that the Hospital was deliberately discharging older, more experienced

nurses. Instead, the CNO, Ms. Schmidt-Bernhardt, attacked Ms. Carrasco's ability to be an ICU charge nurse, asserting that "other" (unidentified) nurses who worked in the ICU were not happy with [Ms. Carrasco] because she "was always frazzled and they don't like that."

45.     Ms. Carrasco construed the criticism that she "was always frazzled" as a code that she was too old (or too disabled) to perform the position of charge nurse in the ICU. Further, the accusation that she was always frazzled was nonsensical.

46.     In light of the fact that Ms. Carrasco had been an ICU charge nurse for more than seven years – and that (a) she had never before been criticized for being "frazzled"; (b) her reviews did not suggest such a problem; (c) she was not counseled or warned about such a problem; and (d) she was not put on any corrective action or performance improvement plan to address such a problem –  she understood the "always frazzled" criticism to be nothing more than a vague and subjective pretext with no basis in fact, that St. Mary-Corwin was using as an excuse for removing her from the ICU charge nurse position.

47.     Additionally, the "always frazzled" criticism, examined fairly, made no sense. Essentially, Centura was saying the following: (1) Ms. Carrasco had worked as an ICU charge nurse for more than seven years. (2) When she returned from FMLA leave after being injured on the job, she changed and was always frazzled. (3) Her co-workers complained so much about her new, constantly-frazzled state, that Centura believed it had to act immediately, and remove Ms. Carrasco from her position, without notice, inquiry, or warning, while Ms. Carrasco was out sick with influenza and pneumonia and could not have affected the work or attitudes of her co-workers..

48.     Accordingly, the "always frazzled" assertion was facially pretextual. Ms. Carrasco worked well with the other nurses in ICU. Further, she had learned to deal with work emergencies and stress better than almost anybody else in the ICU.

49.     Ms. Schmidt-Bernhardt told Ms. Carrasco that the Hospital had decided not to discharge her, so she was eligible to apply for other positions within the hospital, just not in the ICU. (After she said this Mr. Moore looked at her with surprise and she then said that Ms. Carrasco could apply to the ICU, but the director, manager, and nurses did not want her back.)

50.     Ms. Schmidt-Bernhardt tried to spin the decision to remove Ms. Carrasco as a positive one for Ms. Carrasco. Since Ms. Carrasco had first gone out on workers' compensation leave in May 2016, Ms. Schmidt-Bernhardt said, Ms. Carrasco's manager had come to Ms. Schmidt-Bernhardt multiple times to see about firing Ms. Carrasco, "almost every week." Now Centura was giving Ms. Carrasco a chance to work somewhere else.

51.     Ms. Schmidt-Bernhardt's assertion that Ms. Carrasco's manager, Dawn Anderson, had supposedly gone to Ms. Schmidt-Bernhardt multiple times to see about firing Ms. Carrasco was completely unknown to her. Ms. Carrasco had never been told that Ms. Anderson (or anyone else) wanted to fire her while she was out on leave.

52.     Regardless of whether the Hospital officially "fired" Ms. Carrasco on February 16, 2017 or at a later date, the action taken by Centura – removing her from her position as the ICU charge nurse – was an adverse employment action.

53.     By the end of Ms. Carrasco's meeting with Mr. Moore, Ms. Kennedy, and Ms. Schmidt-Bernhardt, it had become clear to Ms. Carrasco that she would not be allowed to perform her job of charge nurse in the ICU. Nonetheless, Ms. Carrasco acted professionally; she thanked

Mr. Moore, Ms. Kennedy, and Ms. Schmidt-Bernhardt for their courtesy in meeting with her. Ms. Carrasco reiterated her concern that because of the reduction in experienced ICU nurses, there would not be enough experienced nurses to keep accidents from happening.

54.     After Ms. Carrasco returned to her home following the meeting with Mr. Moore, Ms. Kennedy, and Ms. Schmidt-Bernhardt, Ms. Carrasco checked the position board on Centura's network. It showed the ICU charge nurse position as posted but not filled. This was true for the next several weeks.

55.     From time to time, Ms. Carrasco also checked with other nurses on the ICU unit who told her that while other nurses had been hired in the ICU unit, no new person had been hired for the charge nurse position.  Thus, Ms. Carrasco's exact position of ICU charge nurse was not filled in a timely manner (although upon information and belief, nurses who were much younger than Ms. Carrasco were hired to work in the ICU), and it appears that the ICU charge nurse position was never filled. Nonetheless, the allegations set forth in this complaint show that Ms. Carrasco's discharge occurred under circumstances which give rise to an inference of discrimination.

56.     Ms. Carrasco still wanted to work. Indeed, she did not plan on retiring until she reached at least sixty-seven years of age. Accordingly, Ms. Carrasco began applying for other positions within the Hospital. These jobs included, among other positions, a pre-op position, a radiology position, and a Manager's night duty position.

57.     A curious pattern developed with these job postings.  After Ms. Carrasco applied for the positions, she was either told they had been filled, or they were pulled and reissued with job requirement she did not meet.  For example, she was told that the radiology position had been filled with an emergency room nurse. Ms. Carrasco later discovered that the emergency room nurse

had quit working at the Hospital.  Similarly, the pre-op position was pulled and then reposted with different requirements so that Ms. Carrasco was no longer able to meet them. Ms. Carrasco concluded from this pattern that she was being blackballed and would be unable to find a new position at St. Mary-Corwin.

58.     Ms. Carrasco also attempted to find a job at the other hospital in the area, but her search was unsuccessful. Initially, the people who interviewed Ms. Carrasco at the other area hospital were enthusiastic, but then their interest waned without explanation. Ms. Carrasco eventually concluded that her applications were being rejected because of poor references from St. Mary Corwin.  Among other things, Ms. Carrasco's former supervisor at St. Mary-Corwin, Dawn Anderson, had friends at the other hospital, and, upon information and belief, Ms. Anderson has told her friends negative things about Ms. Carrasco.

59.     The effect the retaliatory removal/discharge on Ms. Carrasco has devastated her emotionally, and interfered with her efforts to interview for and obtain a new position. Ms. Carrasco has no confidence, and she finds it hard to look people in the eye, as if she is wearing a badge of shame for being fired.   And, despite Ms. Carrasco's excellent qualifications and experience, she has been unable to find another job.  The rejections have shaken her and she is questioning whether she has any value as a nurse or as a person.  Ms. Carrasco feels empty and valueless. Some days she cannot stop herself from breaking down in tears.  Considering all the requirements to be a Critical Care Nurse, Ms. Carrasco no longer gets any joy from her profession.

**FIRST CLAIM FOR RELIEF**
**(FMLA Retaliation, in Violation of 29 U.S.C. § 2615)**

60.     Ms. Carrasco incorporates by reference the allegations set forth in paragraphs 1 through 59 as if fully set forth in this Claim for Relief.

61.     Centura is an employer, as that term is defined in 29 U.S.C. § 2611(4)(A).

62.     Centura is engaged in commerce, industry, or an activity affecting commerce, as that term is defined in 2611(1).

63.     Prior to her removal/discharge, Ms. Carrasco was an eligible employee as that term is defined in 29 U.S.C. § 2611(2)(a).

64.     The FMLA authorizes claims for interference or for retaliation.  *See* 29 U.S.C. § 2615(a)(1) (interference); 29 U.S.C. § 2615(a)(2) (retaliation). A retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work.

65.     On or about May 4, 2016, Ms. Carrasco injured her shoulder on the job.

66.     The injury was a serious health condition.

67.     Ms. Carrasco engaged in a protected activity by going on workers' compensation leave and working on modified duty for twelve weeks.

68.     Because her serious health condition extended beyond twelve weeks, Ms. Carrasco then engaged in a second protected activity by being placed on and taking FMLA leave for an additional twelve weeks.

69.     After twelve weeks of FMLA leave, Ms. Carrasco was restored to her prior employment status of charge nurse for the ICU.

70.     Slightly less than three months after Ms. Carrasco was restored to her prior employment status, she got sick with the influenza, which turned into pneumonia. Ms. Carrasco took sick leave for six working days.

71.     Ms. Carrasco had ample sick leave time (and if necessary vacation time), to cover her six days of sick leave due to the influenza and pneumonia.  When she returned to work, she was told that she had been removed from her position as ICU charge nurse, and that position had been posted and supposedly filled.  The representation that the ICU charge nurse position had been filled was false.

72.     Removal from her position as ICU charge nurse was an adverse employment activity, supposedly because she had taken six days sick leave after she got the influenza and pneumonia.  Further, because Ms. Carrasco was unable to find another position, and because she has not worked since the removal, it was tantamount to a constructive or actual discharge.

73.     Additionally, the violation of the FMLA was willful.

74.     Centura's removal of Ms. Carrasco from the ICU charge nurse position was also causally connected to Ms. Carrasco's exercise of her right to take FMLA leave. Among other things, Centura has admitted that fact. According to the Chief Nursing Officer, after Ms. Carrasco took workers' compensation modified duty, and then took FMLA leave, **the Hospital decided it wanted to get Ms. Carrasco out of the position she held because she had taken so much workers' compensation and FMLA leave. As a result, when Ms. Carrasco got pneumonia and influenza in February 2017, the Hospital saw her illness as an opportunity to get rid of Ms. Carrasco by posting her position, and removing her from it, ostensibly because she did not have any more FMLA leave**. Further, the short period of time between Ms. Carrasco's return from FMLA leave and her removal supports an inference that Ms. Carrasco's removal/discharge was causally connected to her exercise of her FMLA rights.

75.     Further, the two reasons advanced by Centura for Ms. Carrasco's removal are pretexual. First, Centura has taken the position that Ms. Carrasco was removed because she exceeded her allowable FMLA leave when she took six sick days after catching the influenza and pneumonia. But Ms. Carrasco had sufficient amounts of both sick leave and vacation leave to cover the six days she was sick. Moreover, when Ms. Carrasco was off for six days of sick leave, she followed the precise instructions of Ms. Storey. Still further, the Hospital lied to Ms. Carrasco when it told her that the ICU charge nurse position had been filled, and thus she could have been reinstated to that position.  The fact that Centura could have reinstated Ms. Carrasco despite any technical infraction, but did not do so, shows that this reason for removing Ms. Carrasco was pretextual.

76.     The second reason given by Centura for removing Ms. Carrasco from her position was that that other ICU nurses felt Ms. Carrasco "was always frazzled and they don't like that." This vague, subjective (and false) reason is also pretextual. Ms. Carrasco (a) had been an ICU charge nurse for more than seven years and had never before been criticized for being "frazzled"; (b) her  reviews did not suggest such a problem; (c) she was not counseled or warned about such a problem; and (d) she was not put on any corrective action or performance improvement plan to address such a problem. Further, Ms. Carrasco worked well with the other nurses in ICU, and had learned to deal with work emergencies and stress better than almost anybody else in the ICU.

77.     Because of Centura's retaliation for Ms. Carrasco's exercise of her FMLA rights, she has been damaged, and she is entitled to recover damages, including back pay, front pay, attorney fees and costs, and such other damages that are recoverable under the FMLA.

78.     Additionally, because Centura cannot prove that the act or omission that violated the FMLA was in good faith, and that it had reasonable grounds for believing that the act or omission was not a violation of the FMLA, Ms. Carrasco is entitled to recover liquidated damages in an amount equal to wages, salary, employment benefits, or other compensation denied or lost to such an employee by reason of the violation.

## SECOND CLAIM FOR RELIEF
### (Wrongful Discharge in Violation of Public Policy)

79.     Ms. Carrasco incorporates by reference the allegations set forth in paragraphs 1 through 78 as if fully set forth in this Claim for Relief.

80.     On or about May 4, 2016, Ms. Carrasco injured her shoulder on the job.

81.     Ms. Carrasco engaged in a protected activity by going on workers' compensation leave and working on modified duty for twelve weeks.

82.     Because her serious health condition extended beyond twelve weeks, Ms. Carrasco then engaged in a second protected activity by being placed on and taking FMLA leave for an additional twelve weeks.

83.     After twelve weeks of FMLA leave, Ms. Carrasco was restored to her prior employment status of charge nurse for the ICU on November 5, 2016.

84.     Slightly less than three months after Ms. Carrasco was restored to her prior employment status, she contracted influenza, which turned into pneumonia. Ms. Carrasco took sick leave for six working days.

85.     Ms. Carrasco had ample sick leave time (and if necessary vacation time), to cover her six days of sick leave due to the influenza and pneumonia.

86.     When she returned to work, she was told that she had been removed from her position as ICU charge nurse, and that position had been posted and supposedly filled.

87.     Centura's removal of Ms. Carrasco from the ICU charge nurse position was causally connected to Ms. Carrasco's exercise of her right to take CWCA leave. According to the Chief Nursing Officer, after Ms. Carrasco took workers' compensation modified duty, and then took FMLA leave, the Hospital decided it wanted to get Ms. Carrasco out of the position she held **because she had taken so much workers' compensation and FMLA leave.** As a result, when Ms. Carrasco got pneumonia and influenza in February 2017, the Hospital saw her illness as an opportunity to get rid of Ms. Carrasco by posting her position, and removing her from it, ostensibly because she did not have any more leave.   The sick/vacation time that had accrued for Ms. Carrasco, however, was never used.

88.     In removing Ms. Carrasco, Centura punished her for exercising an important job-related right or privilege.

89.     Centura's removal of Ms. Carrasco violated the CWCA, a specific statute relating to public health, safety, or welfare.

90.     Centura's removal of Ms. Carrasco also undermined a clearly expressed public policy relating to the employee's right or privilege as a worker.

91.     Centura was aware, or reasonably should have been aware, that its actions were violative of the employee's legal right or privilege as a worker.

92.     Centura's removal of Ms. Carrasco for exercising her CWCA rights constituted a wrongful discharge in violation of public policy.

93.     Because of Centura's retaliation for Ms. Carrasco's exercise of her workers' compensation rights, she has suffered injury and damages, in an amount to be proven at trial.

94.     Upon information and belief, Ms. Carrasco's termination was part of the employer's larger pattern or practice of retaliating against employees who sought workers' compensation benefits. Accordingly, Ms. Carrasco is entitled to recover punitive damages.

## JURY DEMAND

Ms. Carrasco demands a jury trial on all claims or issues so triable.

## PRAYER FOR RELIEF

ACCORDINGLY, Ms. Carrasco requests judgment in her favor, and against Centura for the following:

A.     Back pay, including but not limited to wages, salaries, bonuses, and benefits, to be adjusted for tax consequences of receiving a lump-sum back pay in a single year;

B.     Front pay;

C.     Pre- and post-judgment interest at the statutory rate;

D.     Costs, expenses, and attorney fees incurred in connection with this action;

E.     Liquidated damages;

F.     Punitive damages;

G.     Equitable relief, not otherwise requested in this Prayer for Relief;

H.     Affirmative relief such as expunging adverse material from personnel files, and providing positive letters of recommendation; and

I.     Such other and further relief as this Court deems just and proper.

Respectfully submitted this 11th day of February, 2019.

ANDERSON BARKLEY, LLC

*A duly signed copy is on file at the*
*offices of Anderson Barkley, LLC*

*s/ Jeanine M. Anderson*
Jeanine M. Anderson
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1766
Jeanine@AndersonBarkleyLaw.com

*Attorney for Plaintiff*